ILLINOIS TOOL WORKS, INC., Plaintiff-Appellant and Cross-Appellee, v. INDEPENDENT MACHINE CORPORATION, Defendant-Appellee and Cross-Appellant.

First District (4th Division)   No. 1—02—2163

Opinion filed December 31, 2003.

Sanchez & Daniels, of Chicago (John D. Daniels, Mark E. Winters, and Nilgun Aykent Zahour, of counsel), for appellant.

Joseph P. Postel, of Meachum, Spahr, Cozzi, Postel, Zenz & Matyas, of Chicago, for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

This contribution action was brought by plaintiff Illinois Tool Works, Inc. (ITW), against defendant Independent Machine Corp. (IMC) to recover damages allegedly in excess of its *pro rata* share of liability in an underlying lawsuit. After a bench trial, the trial court apportioned responsibility for the plaintiff's injuries and then entered the judgment from which both the plaintiff and the defendant appeal. For the reasons that follow, we affirm and modify the trial court's decision.

On May 8, 1998, Armando and Patrizia Lucas (Lucas plaintiffs) filed a four-count complaint against ITW and IMC sounding in strict liability and negligence. In that underlying complaint, the Lucas plaintiffs alleged that while Armando Lucas was employed by Tapecoat Co. (Tapecoat), he sustained injuries as a result of an incident that occurred during his operation of a "hot melt coating line," which was manufactured in part by ITW and in part by IMC. On August 17, 1998, ITW filed its answer to the Lucases' complaint and denied all material allegations against it. ITW and IMC then cross-claimed against each other for contribution of all sums that were to be assessed against them individually in excess of their relative proportionate share of fault and equitably attributable to the other. In addition, ITW and IMC both impleaded the employer, Tapecoat, for contribution.

On March 1, 2000, Tapecoat filed its answer to ITW's and IMC's complaints for contribution in which it denied all allegations and, alternatively, asserted that any liability it owed in contribution was capped by the amount of its statutory liability under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2000)) as stated in *Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d 155 (1991).

Just before trial, ITW and Tapecoat—but not IMC—settled with the Lucas plaintiffs. ITW agreed to pay $2 million, and Tapecoat waived the worker's compensation lien it had on the Lucas plaintiffs' claim pursuant to section 5(b) of the Act (820 ILCS 305/5(b) (West 2000)). The value of that lien was $234,421.97, which amounted to 10.5% of the total settlement. Thereafter, ITW and Tapecoat filed motions for good-faith and settlement findings which indicated that the Lucas plaintiffs had accepted ITW's and Tapecoat's settlement offers. Both motions were granted, and the Lucas plaintiffs' claims against ITW, IMC and Tapecoat were all dismissed.

Accordingly, the only remaining causes of action were ITW's and IMC's cross-claims against each other for contribution, and those claims proceeded to a bench trial. After hearing all of the evidence presented, the trial court apportioned responsibility as follows:

|  | "Pro rata share | Amount already paid |
|---|---|---|
| Independent Machine Corporation | 30% | $ 0 |
| Illinois Tool Works | 35% | $ 2,000,000 |
| Tapecoat Company | 35% | $ 234,421.97." |

After that judgment, ITW argued that the trial court could not find Tapecoat any more than 10.5% at fault, because its liability was capped at that percentage by the supreme court's decision in *Kotecki*. The trial court rejected ITW's argument and entered judgment against ITW for $782,047.69, which represents 35% of the total settlement. The court also entered judgment for contribution in favor of ITW and against IMC in the amount of $670,326.57. The focus of both cross-appeals is the amount and proper calculation of the judgment award.

■ The issues presented on appeal involve statutory construction and waiver, and the core facts of this case are not in dispute. "Where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law whether the facts proved constitute waiver." *Liberty Mutual Insurance Co. v. Westfield Insurance Co.*, 301 Ill. App. 3d 49, 53 (1998). Similarly, an issue of statutory construction is a question of law, and all questions of law are subject to a *de novo* review. *Health Professionals, Ltd. v. Johnson*, 339 Ill. App. 3d 1021, 1026 (2003).

■ By way of background, the Illinois Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/1 *et seq.* (West 2000)) provides in pertinent part:

"(a) Except as otherwise provided in this Act, where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them.

(b) The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is liable to make contribution beyond his own *pro rata* share of the common liability." 740 ILCS 100/2(a),(b) (West 2000).

And, as the supreme court has noted, the Contribution Act promotes two important policies:

"First, the Act encourages the equitable apportionment of damages by allowing for a right of contribution among joint tortfeasors when one tortfeasor pays more than his *pro rata* share of common liability. (740 ILCS 100/2(b) (West 1992).) The Act also ensures the equitable apportionment of damages between settling and nonset-

tling tortfeasors by providing that the amount that the plaintiff recovers on a claim against any other nonsettling tortfeasors will be reduced or set off by the amount stated in the settlement agreement between the plaintiff and the settling tortfeasor or the actual amount paid by the settling tortfeasor in consideration for the release of the settling tortfeasor from liability, whichever is greater \*\*\*. (740 ILCS 100/2(c) (West 1992).) Second, the Act encourages tortfeasors to settle with an injured plaintiff by providing that a tortfeasor who enters into a good-faith settlement agreement with an injured party is discharged from contribution liability to any other tortfeasor. 740 ILCS 100/2(c), (d) (West 1992)." *In re Guardianship of Babb*, 162 Ill. 2d 153, 171 (1994).

■ We note that calculation of the amount of the contribution is also mandated by statute:

"The pro rata share of each tortfeasor shall be determined in accordance with his relative culpability. However, no person shall be required to contribute to one seeking contribution an amount greater than his pro rata share unless the obligation of one or more of the joint tortfeasors is uncollectible. In that event, the remaining tortfeasors shall share the unpaid portions of the uncollectible obligation in accordance with their pro rata liability." 740 ILCS 100/3 (West 2000).

However, while an employer may be subject to contribution, its liability is strictly limited to the amount of its worker's compensation liability. As the court in *Kotecki* remarked:

"Limiting the amount of contribution of an employer to its liability under workers' compensation:

'allows the third party to obtain limited contribution, but substantially preserves the employer's interest in not paying more than workers' compensation liability. While this approach may not allow full contribution recovery to the third party in all cases, it is the solution we consider most consistent with fairness and the various statutory schemes before us.' [Citation.]" *Kotecki*, 146 Ill. 2d at 165.

Consequently, in the present case, the maximum amount that Tapecoat would be responsible for compensating the Lucas plaintiffs' alleged injuries would be the amount of its statutory worker's compensation liability, or $234,421.97.

At the outset, we remark that we are in agreement with a proposition made by IMC in its reply brief that Minnesota law is instructive in addressing this issue. In fact, because the supreme court's decision in *Kotecki* is based almost entirely on the Minnesota Supreme Court's decision in *Lambertson v. Cincinnati Corp.*, 312 Minn. 114, 257 N.W.2d 679 (1977), we find Minnesota law to be particularly didactic in ad-

dressing the interplay between the Contribution Act and the Workers' Compensation Act. See Schachter, *Kotecki v. Cyclops Welding Corp.: A Judicial Balancing Act*, 42 DePaul L. Rev. 741, 762 (1992) ("The Illinois Supreme Court based its decision in *Kotecki* on the Minnesota Supreme Court's decision in *Lambertson v. Cincinnati Corp.* Therefore, the foregoing discussion of *Lambertson* and its progeny lends insight into the *Kotecki* decision").

ITW's main argument on appeal is that because it settled with the Lucas plaintiffs for $2 million and was to receive only $670,326.57 from IMC plus the $234,421.97 amount of Tapecoat's statutory worker's compensation liability, ITW then became solely responsible for the amount that was uncollectible from Tapecoat, *i.e.*, the difference between Tapecoat's *pro rata* share of responsibility and the amount at which its liability was capped under *Kotecki*. In other words, ITW argues, the trial court's decision essentially made ITW liable for its *pro rata* share of $782,047.69 (35% of the common liability) plus the amount that was not collectible from Tapecoat because of its liability cap, $547,625.72, for a total of $1,329,673.41, or nearly 60% of the common liability.

ITW argues that the trial court's judgment award is contrary to both of the stated public policies of the Contribution Act because it forces ITW to pay more than its equitable share of the responsibility and because such a holding actually discourages settlement in instances where an employer may be added as a defendant because the employer's liability is capped under *Kotecki*. And, according to section 3 of the Contribution Act, because the $547,625.72 is uncollectible from Tapecoat, it becomes the responsibility of the remaining tortfeasors who are jointly and severally liable to share that uncollectible obligation in accordance with their *pro rata* liability. 740 ILCS 100/3 (West 2000).

ITW then notes that the supreme court addressed the effect of the *Kotecki* cap limit in determining the *pro rata* share of parties to a contribution action in *Claudy v. Commonwealth Edison Co.*, 169 Ill. 2d 39 (1995). There, the plaintiff brought a wrongful death action against the City of Chicago and the Commonwealth Edison Company in connection with the death of her husband, who was electrocuted while removing a tree near power lines. *Claudy*, 169 Ill. 2d at 40. The City of Chicago filed a contribution action against the plaintiff's decedent's employer, AAA Tree Service, and plaintiff also filed a workers' compensation claim against the employer. *Claudy*, 169 Ill. 2d at 40. Thereafter, the plaintiff and the City of Chicago agreed that $500,000 constituted the amount of damages suffered by the plaintiff and, based upon that figure, settled the wrongful death suit. *Claudy*,

169 Ill. 2d at 41. Of that settlement amount, the City of Chicago paid the plaintiff $400,000 and assigned to the plaintiff its right to contribution against AAA Tree Service. *Claudy*, 169 Ill. 2d at 41. In addition, the workers' compensation lien in that matter was $102,876.09. *Claudy*, 169 Ill. 2d at 41.

The circuit court in *Claudy* then dismissed the contribution action against AAA Tree Service, which led to the appeal. Two issues were present before the supreme court: (1) whether a third-party complaint was assignable; and (2) whether there was a viable contribution action for the City of Chicago to assign to the plaintiff. The supreme court found that it did not have to decide the propriety of the assignment of the right to contribution because it found that the City of Chicago did not pay in excess of its *pro rata* share of the common liability:

> "[W]e observe that the record discloses that in reaching a settlement agreement the city and plaintiff agreed that $500,000 represented the plaintiff's damages. Thus, it necessarily follows that $500,000 is the common liability for purposes of the Contribution Act. 740 ILCS 100/2(b) (West 1992)." *Claudy*, 169 Ill. 2d at 43.

However, ITW argues that what is most relevant to the case at bar is the supreme court's calculation of each defendant's *pro rata* share of responsibility in *Claudy*:

> "Had the city paid plaintiff the entire $500,000 common liability and then pursued its contribution action against the employer, the most the city could have hoped to recover from the employer in its contribution action would be $100,000, the amount of the workers' compensation award. In light of the contribution limitations of *Kotecki*, $500,000 less the maximum contribution of $100,000 from the employer constitutes the city's effective *pro rata* share. (*Kotecki*, 146 Ill. 2d at 165.) Of course, $500,000 less the anticipated contribution amount of $100,000 equals $400,000, the amount paid by the city to the plaintiff in full settlement of plaintiff's suit against the city.
>
> Insofar as the city did not pay in excess of its effective *pro rata* share, it necessarily follows that it had no right to contribution to assign in the first place. (740 ILCS 100/2(b) (West 1992) ('right of contribution exists only in favor of a tortfeasor who has paid more than his *pro rata* share of the common liability').) Because the city had no right to contribution to assign, the purported assignment in the settlement agreement was void *ab initio*." *Claudy*, 169 Ill. 2d 44-45.

In a footnote, the supreme court elucidated its reasoning:

> "If the city had paid plaintiff the whole $500,000 and then sought contribution from the employer, it would have been entitled to $100,000, but no more, so long as the contribution jury determined

that the employer was at least 20% responsible for plaintiff's injuries, an assumption both plaintiff and the city shared in their negotiations. Indeed, while the city may ultimately be liable for in excess of $400,000 under this scenario, under no circumstances would its effective *pro rata* share be less than $400,000." *Claudy*, 169 Ill. 2d at 44 n.1.

ITW argues that while the circumstances in *Claudy* are not precisely similar to the case *sub judice*, it asserts that the supreme court made it clear that in determining a potential *pro rata* share of contribution to the defendant, the *Kotecki* cap serves to limit the percentage of liability that can be attributable to Armando Lucas's employer. In other words, in *Claudy*, the plaintiff's employer could never be apportioned a *pro rata* share of liability in excess of 20% of the $500,000 settlement and, therefore, the City of Chicago's $400,000 payment could "under no circumstances" be less than the $400,000 it actually paid the plaintiff.

As noted, in the present case, Tapecoat paid the Lucas plaintiffs $234,421.97 in settlement, but the trial court's finding that Tapecoat was 35% responsible required a *pro rata* share payment of $782,047.69 toward common liability. However, because Tapecoat's liability was capped under *Kotecki* at $234,421.97, $547,625.72 was left as uncollectible. Accordingly, ITW concludes, the remaining uncollectible amount of $547,625.72 should have been apportioned among the remaining joint tortfeasors, ITW and IMC, to determine what percentage of that uncollectible amount that each owes.

IMC first responds that ITW waived its right to seek reallocation of Tapecoat's allegedly uncollectible share as well as its right to rely upon section 3 of the Contribution Act because it failed to seek that relief or cite that section of the statute before the trial court, and argued only that the result it sought was dictated by *Kotecki*. IMC claims that ITW's *Kotecki* argument was misplaced because it failed to recognize the difference between seeking recovery from an employer and simply attributing fault to an employer in an action in which no recovery will ever be sought against the employer. And because the only authorities to which ITW cited involved actions against the employer—*e.g., Claudy*—they are distinguishable from the present case. Ultimately, IMC asserts that the trial court made a correct ruling based upon the authorities that ITW presented to it. However, because ITW failed to seek a reallocation of Tapecoat's allegedly uncollectible share and failed to cite section 3 of the Contribution Act to the trial court, its rights to make those arguments before this court are waived.

As IMC notes, it has long been held that arguments not raised in the trial court are considered waived on appeal. *Killion v. Meeks*, 333

Ill. App. 3d 1188, 1190 (2002). Indeed, other courts have used the waiver rule to find that a party who cites one statute to the trial court may not cite another statute for the first time on appeal, even where the statutes are part of the same legislative scheme. See, *e.g.*, *Jackson v. Cook County Regional Board of School Trustees*, 282 Ill. App. 3d 191, 195-96 (1996) (held that the plaintiffs who relied upon one section of the School Code (105 ILCS 5/7 (West 1992)) were not allowed to cite another section of the School Code (105 ILCS 5/7—2(b) (West 1992)) on appeal).

In the present case, IMC argues that the trial court never had an opportunity to consider the application of section 3 of the Contribution Act, nor any opportunity to consider whether to reallocate the excess share in accordance with that section, because ITW failed to cite it. Accordingly, IMC asserts that ITW waived reliance on that statute and the right to seek reallocation, and that we should confine our review only to the relief requested and the authorities presented to the trial court. In that regard, IMC concludes, because the only authorities ITW cited in support of its arguments were distinguishable cases involving actions brought specifically against employers, we should affirm the trial court's decision.

Alternatively, IMC asserts that even if we were to find that ITW did not waive this argument, section 3 of the Contribution Act is inapplicable because Tapecoat's share of the responsibility is not "uncollectible." In looking to Minnesota case law, IMC argues that it is well established that "the obligation of a settling tortfeasor is not uncollectible." *Gregor v. Clark*, 560 N.W.2d 744, 745 (Minn. App. 1997).

In the present case, IMC reiterates that where the value of Tapecoat's lien was $234,421.97 (the amount it paid in settlement) and the monetary value of its 35% fault attribution was $782,047.69, the difference remaining is $547,625.72. Under *Gregor*, however, IMC argues that the amount by which the trial court's determination of Tapecoat's fault exceeded the settlement it actually paid does not constitute an "uncollectible" share. Consequently, IMC continues, the reallocation required by section 3 of the Contribution Act is not required in this case because that statute is inapplicable. Such a result, IMC notes, would also be mandated under Minnesota law, where Minnesota courts have consistently held that the statutory provision for reallocation of uncollectible shares does not permit reallocation of an employer's share. See *Hahn v. Tri-Line Farmers Co-op*, 478 N.W.2d 515, 521-22 (Minn. App. 1991); *Bursch v. Beardsley & Piper*, 971 F.2d 108 (8th Cir. 1992) (applying Minnesota law).

■ We do not think that ITW has waived this issue for appeal. In the trial court, ITW proceeded under section 2 of the Contribution Act

seeking the equitable apportionment of damages, based on *pro rata* shares of responsibility, so that it would not have to pay more than its *pro rata* share of fault. Unquestionably, therefore, it sought a determination of how to equitably apportion the total amount of responsibility, in light of the fact that the maximum amount of damages for which Tapecoat would be responsible was capped by *Kotecki* and was less than its determined share of responsibility of 35%. On appeal, ITW again argues that the trial court's decision essentially made ITW liable for its *pro rata* share plus the amount that was not collectible from Tapecoat because of its liability cap. It then goes on to assert that section 3 of the Contribution Act mandates the remaining tortfeasors who are jointly and severally liable to share that uncollectible obligation in accordance with their *pro rata* liability. Because we think these arguments advance, in essence, identical theories, we find that ITW has not waived this argument for our review.

In so holding, we find IMC's citation to *Jackson* to be inapposite to the facts here. In *Jackson*, plaintiffs brought a petition for the administrative review of a decision of the Cook County Regional Board of School Trustees (Regional Board) that denied a petition for the detachment of territory from one high school district and annexation to another. *Jackson*, 282 Ill. App. 3d at 193. In their petition for administrative review, plaintiffs relied on section 7—1 of the School Code and specifically stated before the Regional Board that they did not wish to proceed under section 7—2b of the School Code. *Jackson*, 288 Ill. App. 3d at 195-96. After their petition was denied, they appealed and argued that section 7—2b was the relevant and applicable code section. *Jackson*, 288 Ill. App. 3d at 194. In affirming the trial court's decision, this court found that the plaintiffs had a choice to proceed with their petition under either section 7—1 or section 7—2b, or both. *Jackson*, 288 Ill. App. 3d at 195-96. However, because plaintiffs expressly chose to proceed under section 7—1 and made the overt decision not to proceed under section 7—2b, this court found the issue was not properly before it. *Jackson*, 288 Ill. App. 3d at 196. In the present case, ITW has always proceeded under the theory that section 2 of the Contribution Act prohibits it from being responsible for more than its *pro rata* share of fault, and has always sought a determination as to how to equitably apportion that total amount. Unlike the situation in *Jackson*, ITW here is not arguing that a new and different theory should control on appeal.

However, even if we were to find that ITW did not raise this argument in the trial court, we note that waiver is a limitation on the parties, not the courts. See *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill. 2d 507, 514 (1994). Thus, in order to obtain a just result and maintain

a sound and uniform body of precedent, we decline to waive ITW's argument on appeal. *Geise*, 159 Ill. 2d at 514.

In addressing the merits of ITW's appeal, we agree with ITW that the difference between the amount Tapecoat paid in settlement and the monetary value of its 35% fault attribution is, indeed, uncollectible. While independent research has not revealed a case on point in Illinois, we note that Minnesota has a statutory provision that was enacted to address this very issue. In *Drake v. Reile's Transfer & Delivery, Inc.*, 613 N.W.2d 428 (Minn. App. 2000), the Minnesota Court of Appeals provided the following recitation as to the different methods a prospective plaintiff may use in his or her attempt to collect properly allocated tort proceeds from an underlying judgment:

   ·   "The district court concluded that respondents were entitled as a matter of law to elect a posttrial allocation of the judgment under either *Henning v. Wineman*, 306 N.W.2d 550 (Minn. 1981), or the statutory formula. \*\*\*

      \*\*\*

      The statutory formula does not require that the district court allocate the tort proceeds between damages recoverable and nonrecoverable under workers' compensation law. *Locher v. Gareis*, 411 N.W.2d 273, 275 (Minn. App. 1987). Instead, the employee receives one-third of the amount remaining after costs are deducted. *Kliniski v. Southdale Manor, Inc.*, 518 N.W.2d 7, 9 n.2 (Minn. 1994). The employer/insurer is then reimbursed for its subrogation claim less a proportionate share of attorney fees, and the remainder, if any, is paid to the employee subject to a credit to the employer/insurer for any future benefits payable. *Id.* The statute's provision for an initial one-third payment to the employee recognizes that a tort recovery often includes damages that are nonrecoverable under workers' compensation law; thus, the employee receives this portion of the proceeds free from any subrogation claim by the insurer. *Henning*, 306 N.W.2d at 552.

      In *Henning*, the supreme court held that where the employee settles with the third-party tortfeasor and the settlement includes amounts both recoverable and nonrecoverable under the workers' compensation statutes, the insurer's subrogation recovery can be calculated in one of two ways, at the employee's option. *Id.* The employee can elect to have the statutory allocation formula applied to the entire recovery in the manner described above. Alternatively, the employee can petition the district court to allocate the proceeds between recoverable and nonrecoverable damages, and then have the statutory formula applied only to that part of the settlement allocable to recoverable damages. *Id.* An employee who selects the latter option forfeits the statutory right to receive a one-third share of the settlement. *Id.* at 552-53." *Drake*, 613 N.W.2d at 431-32.

Because Illinois law offers no similar options to prospective plaintiffs who are suing their employers and third parties, the actual Minnesota options themselves are not critical to the issue in the case at bar. However, the impetus behind the creation of those options is of great relevance; specifically, "that a tort recovery often includes damages that are nonrecoverable under workers' compensation law." *Drake*, 613 N.W.2d at 431. Accordingly, in granting IMC's entreaty to find Minnesota law persuasive authority, we also recognize that any portion of an employer's *pro rata* share of liability in excess of its *Kotecki* cap is, indeed, uncollectible from that employer. *Cf. Claudy*, 169 Ill. 2d 44-45. In this case, therefore, we find that the difference between Tapecoat's *Kotecki* cap and its *pro rata* share of liability, $547,625.72, is, indeed, uncollectible.

Moreover, we find that IMC's reliance on *Gregor* is misplaced. While *Gregor* recited the general proposition that "the obligation of a settling tortfeasor is not uncollectible" (*Gregor*, 560 N.W.2d at 745), it was merely expounding the reasoning behind a Minnesota Supreme Court case, *Fredrickson v. Alton M. Johnson Co.*, 402 N.W.2d 794 (Minn. 1987). In *Fredrickson*, a third-party defendant entered into a settlement agreement with the plaintiff prior to trial, and when calculating the allocation of damages, the trial court included that settling defendant in the equation for determining fault. *Fredrickson*, 402 N.W.2d at 796. Thereafter, the court reduced the verdict by the percentage of fault, 40%, attributed to the settling defendant. *Fredrickson*, 402 N.W.2d at 796.

Unlike the present case, however, because the settling party in *Fredrickson* was not plaintiff's employer, no *Lambertson/Kotecki* issues existed. In addition, as noted, the trial court reduced the jury's verdict by the 40% fault attributed to the settling defendant. In other words, the court actually released that portion of the plaintiff's cause of action, thereby reserving the balance of the plaintiff's cause of action against the nonsettling defendants. In the present case, the total responsibility was never diminished by the percentage of fault attributable to ITW and Tapecoat. Instead, the full amount of the common liability remained to be apportioned among the jointly and severally liable defendants. Accordingly, because the court in *Fredrickson* was dealing with an entirely dissimilar factual situation, neither *Fredrickson* nor *Gregor* is persuasive authority in the present case.[1]

In its cross-appeal, IMC then asserts that it is entitled to judg-

---

[1]IMC's citations to *Hahn* and *Bursch* are also inapposite. In both cases, the courts held that Minnesota law did not permit reallocation of an employers' uncollectible share of a verdict to a negligent employee. *Hahn*, 478 N.W.2d

ment as a matter of law because ITW failed to make a *prima facie* case because it did not present sufficient evidence as to the elements of its contribution claim. See *Victory Memorial Hospital Ass'n v. Schmidt, Garden & Erickson*, 158 Ill. App. 3d 931, 934 (1987) (holding that the *prima facie* case standard applies to a motion for directed verdict in a contribution case, where, like the present case, the motion is based on a failure to introduce evidence as to the amount paid by the settling tortfeasor). IMC admits that it did not move for judgment as a matter of law at the close of ITW's case under section 2—1110 of the Code of Civil Procedure (735 ILCS 5/2—1110 (West 2000)). However, it claims that its assertion "at the close of all the evidence" that ITW had failed to introduce evidence on one of the elements of its contribution claim was, in effect, a section 2—1110 motion.

For this argument, IMC does not provide a citation to the record as to *when*, at the close of the evidence, it made its *de facto* section 2—1110 motion. And, in our review of the record, the first time at the close of evidence that we see such a contention being made is during IMC's closing argument. There, IMC's counsel stated:

> "Your Honor, as far as damages are concerned, because this is a contribution action, there has been no evidence of payment of damages produced in this case to this court. The jury instruction IPI 600.09 requires that there be evidence of payment of damages in order for a party to seek contribution for their payment. For the reasons stated above, Independent Machine Company respectfully asks this court to dismiss ITW's counterclaim for its failure to show evidence of payment in excess of its *pro rata* share of damages."

The court then allowed IMC's counsel to submit a memorandum of law into evidence suggesting, *inter alia*, that a party in a contribution action has to show proof of payment as evidence in a case.

██ Section 2—1110 states:

> "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered. If the ruling on the motion is adverse to the defendant, the defendant may proceed to adduce evidence in support of his or her defense, in which event the motion is waived." 735 ILCS 5/2—1110 (West 2000).

at 522; *Bursch*, 971 F.2d at 913. Such a factual situation is not present in the case *sub judice*.

In the present case, not only did IMC fail to make its *de facto* section 2—1110 motion at the close of the plaintiff's case (or, for that matter, before closing arguments in its own case), it then put on evidence in support of its defense. In other words, the trial court never had the opportunity to consider whether ITW had made a *prima facie* case at the close of its evidence, as that issue only surfaced in IMC's closing arguments *after* it had presented evidence in its defense. Accordingly, even if we could construe IMC's argument as a section 2—1110 motion—which, due to when the issue was raised, we cannot—IMC waived that motion once it presented evidence in its defense. See *Falcon v. Thomas*, 258 Ill. App. 3d 900, 903 (1994). Because IMC's argument is not properly before this court, we affirm the trial court's decision to enter judgment in ITW's favor and against IMC.

■ In finding the difference between Tapecoat's *Kotecki* cap and its *pro rata* share of liability to be uncollectible, and affirming the trial court's judgment against IMC, our next task is then to determine how to properly apportion that uncollectible share. To reiterate, section 3 of the Contribution Act states that "no person shall be required to contribute to one seeking contribution an amount greater than his pro rata share unless the obligation of one or more of the joint tortfeasors is uncollectible. In that event, the remaining tortfeasors shall share the unpaid portions of the uncollectible obligation in accordance with their pro rata liability." 740 ILCS 100/3 (West 2000). In looking at the plain meaning of that language, we find that ITW's proposed method of reallocation in this situation is what section 3 of the Contribution Act requires.

To determine Tapecoat's actual *pro rata* share of liability, we divide the amount paid by Tapecoat by the total common liability:

$$\frac{\$234,421.97 \text{ (amount paid by Tapecoat)}}{\$2,234,421.97 \text{ (common liability paid to Lucas plaintiffs)}} = 10.5\%$$

Therefore, the remaining percentage of responsibility after Tapecoat's liability is deducted is 89.5%.[2] Then, to properly calculate what percentage of that uncollectible amount each defendant owes, we are

---

[2]We note that in *Fredrickson*, the Minnesota Supreme Court upheld the trial court's determination to reduce the jury verdict by the 40% fault attributable to the settling defendant. *Fredrickson*, 402 N.W.2d at 797. Such a finding could be interpreted to imply that, in the present case, we too should reduce the total judgment by the 35% attributable to Tapecoat. However, in *Fredrickson*, the settling defendant entered into an agreement with the plaintiff whereby the parties agreed that plaintiff "settles and satisfies that percentage of [plaintiff's] total claim for damages against all parties arising out of the accident *** which shall hereafter by further trial or other disposi-

to divide each *pro rata* share of responsibility by the total amount of responsibility attributable to IMC and ITW, 65%, and then multiply that figure by 89.5%—the remaining percentage of responsibility after Tapecoat's liability is deducted. Consequently, for IMC, the calculation is as follows:

> IMC's *pro rata* share (30%) = .461 x .895 = 41.3%
> Total *pro rata* shares of IMC (30%) + ITW (35%) = 65%

ITW's pro rata share of responsibility would be calculated in the same way:

> ITW's *pro rata* share (35%) = .538 x .895 = 48.2%
> Total *pro rata* shares of IMC (30%) + ITW (35%) = 65%

Ultimately, in recognition that Tapecoat's liability was capped, the *pro rata* shares of responsibility should be readjusted as follows:

|  | *Pro Rata* Share | Amount Already Paid |
|---|---|---|
| Independent Machine Corporation | 41.3% | $ 0 |
| Illinois Tool Works | 48.2% | $ 2,000,000.00 |
| Tapecoat Company | 10.5% | $    234,421.97 |
|  | 100% | $ 2,234,421.97 |

Once those percentages have been readjusted, the total common liability of $2,234,421.97 should then be multiplied by IMC's *pro rata* share of responsibility of 41.3% to arrive at the correct judgment award of $922,816.28 against IMC and in ITW's favor.

In the end, we agree with ITW that this judgment award better promotes the dual policy interests of the Contribution Act: settlement and the ability to recover the amount of damages that a joint tortfeasor pays in excess of its *pro rata* share of responsibility. For these reasons and those foregoing, we affirm the trial court's judgment against IMC in ITW's favor, but modify the amount of that judgment

---

tion of this or any other action be determined to be the percentage of causal fault or causal responsibility for which [settling defendant] is found to be liable." *Fredrickson*, 402 N.W.2d at 797. In other words, by entering into that settlement agreement, plaintiff actually released the part of his cause of action for the percentage amount which the settling defendant was ultimately liable, regardless of the actual settlement amount. In the present case, however, no such release was given to Tapecoat. Thus, because Tapecoat could provide only a portion (10.5%) of the amount for which it was liable (35%), the Lucas plaintiffs' claim against it, while settled, was not entirely satisfied. And because that remaining portion of Tapecoat's liability is uncollectible, it is to be apportioned among the other defendants pursuant to section 3 of the Contribution Act.

from $670,326.57 to $922,816.28 due to the effect of the Workers' Compensation Act on the amount of liability the Lucas plaintiffs could recover from Armando Lucas's employer, Tapecoat.

Affirmed as modified.

HARTMAN and THEIS, JJ., concur.